MRS. MABEL ELLIFF ET AL V. TEXON DRILLING COMPANY.

No. A-1401. Decided March 3, 1948.
Rehearing overruled May 12, 1948.
(210 S. W., 2d Series, 558.)

576

*Boone, Boone & Davis, Kemp, Lewright, Dyer, Wilson & Sorrell,* and *J. M. Wilson,* all of Corpus Christi, for petitioners.

*Tarlton, Koch & Hale, McCampbell, Wood & Kirkham* and *Ralph R. Wood,* all of Corpus Christi, for respondents.

MR. JUSTICE FOLLEY delivered the opinion of the Court.

This is a suit by the petitioners, Mrs. Mabel Elliff, Frank Elliff, and Charles C. Elliff, against the respondents, Texon Drilling Company, a Texas corporation, Texon Royalty Company, a Texas corporation, Texon Royalty Company, a Delaware corporation, and John L. Sullivan, for damages resulting from a "blowout" gas well drilled by resepondents in the Agua Dulce Field in Nueces County.

The petitioners owned the surface and certain royalty interest in 3054.9 acres of land in Nueces County, upon which there was a producing well known as Elliff No. 1. They owned all the mineral estate underlying the west 1500 acres of the tract, and an undvided one-half interest in the mineral estate underlying the east 1554.9 acres. Both tracts were subject to oil and gas leases, and therefore their royalty interest in the west 1500 acres was one-eighth of the oil or gas, and in the east 1554.9 acres was one-sixteenth of the oil and gas.

It was alleged that these lands overlaid approximately fifty percent of a hugh reservoir of gas and distillate and that the remainder of the reservoir was under the lands owned by Mrs. Clara Driscoll, adjoining the lands of petitioners on the east. Prior to November 1936, respondents were engaged in the drilling of Driscoll-Sevier No. 2 as an offset well at a location 466 feet east of petitioners' east line. On the date stated, when respondents had reached a depth of approximately 6838 feet, the well blew out, caught fire and cratered. Attempts to control it were unsuccessful, and huge quantities of gas, distillate and some oil were blown into the air, dissipating large quantities from the reservoir into which the offset well was drilled. When the Driscoll-Sevier No. 2 well blew out, the fissure or opening in the ground around the well gradually increased until it enveloped and destroyed Eliff No. 1. The latter well also blew out, cratered, caught fire and burned for several years. Two water wells on petitioners' land became involved in the cratering and each of them blew out. Certain damages also resulted to the surface of petitioners' lands and to their cattle thereon. The cratering process and the eruption continued until large quantities of gas and distillate were drained from under petitioners' land and escaped into the air, all of which was alleged to be the direct and proximate result of the negligence of respondents

in permitting their well to blow out. The extent of the emissions from the Driscoll-Sevier No. 2 and Elliff No. 1, and the two water wells on petitioners' lands, was shown at various times during the several years between the blowout in November 1936, and the time of the trial in June 1946. There was also expert testimony from petroleum engineers showing the extent of the losses from the underground reservoir, which computations extended from the date of the blowout only up to June 1938. It was indicated that it was not feasible to calculate the losses subsequent thereto, although lesser emissions of gas continued even up to the time of the trial. All the evidence with reference to the damages included all losses from the reservoir beneath petitioners' land without regard to whether they were wasted and dissipated from above the Driscoll land or from petitioners' land.

The jury found that respondents were negligent in failing to use drilling mud of sufficient weight in drilling their well, and that such negligence was the proximate cause of the well blowing out. It also found that petitioners had suffered $4,620.00 damage to sixty acres of the surface, and $1,350.00 for the loss of 27 head of cattle. The damages for the gas and distillate wasted "from and under" the lands of petitioners, due to respondents' negligence, was fixed by the jury at $78,580.46 for the gas, and $69,967.73 for the distillate. These figures were based upon the respective fractional royalty interests of petitioners in the whole amount wasted under their two tracts of land, and at a value, fixed by the court without objection by the parties, of two cents per 1,000 cubic feet for the gas and $1.25 per barrel for the distillate.

The findings as to the amount of drainage of gas and distillate from beneath petitioners' lands were based primarily upon the testimony of petitioners' expert witness, C. J. Jennings, a petroleum engineer. He obtained his information from drilling records and electric logs from the high pressure Agua Dulce Field. He was thereby enabled to fairly estimate the amount of gas and distillate. He had definite information as to porosity and bottom-hole pressure both before and after the blowout. He was able to estimate the amount of gas wasted under the Elliff tract by calculating the volume of the strata of sands and the voids which were occupied by gas. Under his method of calculation the determining factor was the decrease in bottom-hole pressures of the sands caused by the blowout. He estimated that 13,096,717,000 cubic feet of gas had been drained from the west 1500 acres of the Elliff land, and that 57,625,728,-

000 cubic feet had been drained from the east 1554.9 acres as a result of the blowout. The distillate loss was calculated by taking the gas and distillate ratio from the records of the Railroad Commission. Jennings estimated that 195,713 barrels had been drained from the west 1500 acres and 802,690 barrels from the east 1554.9 acres, as a result of the blowout.

On the findings of the jury the trial court rendered judgment for petitioners for $154,518.19, which included $148,548.19 for the gas and distillate, and $5,970.00 for damages to the land and cattle. The Court of Civil Appeals reversed the judgment and remanded the cause.

The reversal by the Court of Civil Appeals rests upon two grounds. The first was that since substantially all of the gas and distillate which was drained from under petitioners' lands was lost through respondents' blowout well, petitioners could not recover because under the law of capture they had lost all property rights in the gas or distillate which had migrated from their lands. The second theory was that the recovery cannot stand because the trial court had submitted the wrong measure of damages in that petitioners' claim "is for trespass in and to a freehold estate in land and the proper measure of damage is the reasonable cash market value before and after the occurrence complained of."

■ In our opinion the Court of Civil Appeals was without authority to pass upon the propriety of the measure of damages adopted by the trial court for the simple reason that no such assignment was presented to that court. Although such an objection was raised in the trial court, we do not find an intimation of it brought forward to the Court of Civil Appeals. The question is therefore not before us, and our subsequent conclusions as to the rights of the parties are without reference to the correctness of the measure of damages, and we express no opinion on that question.

Consequently, our attention will be confined to the sole question as to whether the law of capture absolves respondents of any liability for the negligent waste or destruction of petitioners' gas and distillate, though substantially all of such waste or destruction occurred after the minerals had been drained from beneath petitioners' lands.

■ We do not regard as authoritative the three decisons by the Supreme Court of Louisiana to the effect that an adjoining owner is without right of action for gas wasted from the common pool by his neighbor, because in that state only quali-

fied· ownership of oil and gas is recognized, no absolute owner-
ship of minerals in place exists, and the unqualified rule is that
under the law of capture the minerals belong exclusively to the
one that produces them. Louisiana Gas & Fuel Co. v. White
Bros., 157 La. 728, 103 So. 23; McCoy v. Arkansas Natural Gas.
Co. .175 La. 487, 143 So. 383, 85 A. L. R. 1147, cert. den. 287
U. S. 661, 53 Sup. Ct. 220, 77 L. Ed. 570; McCoy v. Arkansas
Natural Gas Co. 184 La. 101, 165 So. 632. Moreover, from an
examination of those cases it will be seen that the decisions
rested in part on the theory that "the loss complained of was,
manifestly, more a matter of uncertainty and speculation than
of fact or estimate." In the more recent trend of the decisions
of our state, with the growth and development of scientific
knowledge of oil and gas, it is now recognized "that when an
oil field has been fairly tested and developed, experts can de-
termine approximately the amount of oil and gas in place in
a common pool, and can also equitably determine the amount of
oil and gas recoverable by the owner of each tract of land under
certain operating conditions." Brown v. Humble Oil & Refining
Co., 126 Texas 296, 83 S. W. (2d) 935, 940, 87 S. W. (2d)
1069, 99 A. L. R. 1107, 101 A. L. R. 1393.

■ In Texas, and in other jurisdictions, a different rule exists
as to ownership. In our state the landowner is regarded as
having absolute title in severalty to the oil and gas in place
beneath his land. Lemar v. Garner, 121 Texas 502, 50 S. W.
(2d) 769; Humphreys-Mexia Co. v. Gammon, 113 Texas 247,
254 S. W. 296, 29 A. L. R. 607; Waggoner Estate v. Sigler Oil
Co., 118 Texas 509, 19 S. W. (2d) 27; Texas Co. v. Daugherty,
107 Texas 226, 176 S. W. 717, L. R. A. 1917F, 989. The only
qualification of that rule of ownership is that it must be con-
sidered in connection with the law of capture and is subject to
police regulations. Brown v. Humble Oil & Refining Co., supra.
The oil and gas beneath the soil are considered a part of the
realty. Each owner of land owns separately, distinctly and ex-
clusively all the oil and gas under his land and is accorded the
usual remedies against trespassers who appropriate the min-
erals or destroy their market value. Peterson v. Grayce Oil Co.,
37 S. W. (2d) 367, affirmed 128 Texas 550, 98 S. W. (2d) 781;
Comanche Duke Oil Co. v. Texas Pac. Coal & Oil Co., (Tex. Com.
App.) 298 S. W. 554; Calor Oil and Gas Co. v. Franzell, 128
Ky. 715, 109 S. W. 328; Louisville Gas Co. v. Kentucky Heating
Co., 117 Ky. 71, 77 S. W. 368, 70 L. R. A. 558, 111 Am.. St.
Rep. 225; Id. 132 Ky. 435, 111 S. W. 374; Ross v. Damm, 278
Mich. 388, 270 N. W. 722; 31A Tex. Jur. 911, Sec. 530; Id. 924,
Sec. 537; 24 Am. Jur. 641, Sec. 159.

██ The conflict in the decisions of the various states with reference to the character of ownership is traceable to some extent to the divergent views entertained by the courts, particularly in the earlier cases, as to the nature and migratory character of oil and gas in the soil. 31A Tex. Jur. 24, Sec. 5. In the absence of common law precedent, and owing to the lack of scientific information as to the movement of these minerals, some of the courts have sought by analogy to compare oil and gas to other types of property such as wild animals, birds, subterranean waters, and other migratory things, with reference to which the common law had established rules denying any character of ownership prior to capture. However, as was said by Professor A. W. Walker, Jr., of the School of Law of the University of Texas: "There is no oil or gas producing state today which follows the wild-animal analogy to its logical conclusion that the landowner has no property interest in the oil and gas in place." 16 T. L. R. 370, 371. In the light of modern scientific knowledge these early analogies have been disproven, and courts generally have come to recognize that oil and gas, as commonly found in underground reservoirs, are securely entrapped in a static condition in the original pool, and, ordinarily, so remain until disturbed by penetrations from the surface. It is further established, nevertheless, that these minerals will migrate across property lines towards any low pressure area created by production from the common pool. This migratory character of oil and gas has given rise to the so-called rule or law of capture. That rule simply is that the owner of a tract of land acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands. He may thus appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands, and without incurring liability to him for drainage. The nonliability is based upon the theory that after the drainage the title or property interest of the former owned is gone. This rule, (at first blush, would seem to conflict with the view of absolute ownership of the minerals in place, but it was otherwise decided in the early case of Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas 160, 254 S. W. 290, 29 A. L. R. 566 (1923). Mr. Justice Greenwood there stated: (113 Texas. 167).

"The objection lacks substantial foundation that gas or oil in a certain tract of land cannot be owned in place, because subject to appropriation, without the consent of the owner of the tract, through drainage from wells on adjacent lands. If the owners of adjacent lands have the right to appropriate,

without liability, the gas and oil underlying their neighbor's land, then their neighbor has the correlative right to appropriate, through like methods of drainage, the gas and oil underlying the tracts adjacent to his own."

■ Thus it is seen that, notwithstanding the fact that oil and gas beneath the surface are subject both to capture and administrative regulation, the fundamental rule of absolute ownership of the minerals in place is not affected in our state. In recognition of such ownership, our courts, in decisions involving well-spacing regulations of our Railroad Commission, have frequently announced the sound view that each landowner should be afforded the opportunity to produce his fair share of the recoverable oil and gas beneath his land, which is but another way of recognizing the existence of correlative rights between the various landowners over a common reservoir of oil or gas.

It must be conceded that under the law of capture there is no liability for reasonable and legitimate drainage from the common pool. The landowner is privileged to sink as many wells as he desires upon his tract of land and extract therefrom and appropriate all the oil and gas that he may produce, so long as he operates within the spirit and purpose of conservation statutes and orders of the Railroad Commission. These laws and regulations are designed to afford each owner a reasonable opportunity to produce his proportionate part of the oil and gas from the entire pool and to prevent operating practices injurious to the common reservoir. In this manner, if all operators exercise the same degree of skill and diligence, each owner will recover in most instances his fair share of the oil and gas. This reasonable opportunity to produce his fair share of the oil and gas is the landowner's common law right under our theory of absolute ownership of the minerals in place. But from the very nature of this theory the right of each land holder is qualified, and is limited to legitimate operations. Each owner whose land overlies the basin has a like interest, and each must of necessity exercise his right with some regard to the rights of others. No owner should be permitted to carry on his operations in reckless or lawless irresponsibility, but must submit to such limitations as are necessary to enable each to get his own. Hague v. Wheeler, 157 Pa. 324, 27 Atl. 717, 22 L. R. A. 141, 37 Am. St. Rep. 736.

While we are cognizant of the fact that there is a certain amount of reasonable and necessary waste incident to the production of oil and gas to which the non-liability rule must also

apply, we do not think this immunity should be extended so as to include the negligent waste or destruction of the oil and gas.

■ In Summers, Oil and Gas, Permanent Edition, Volume 1, page 142, correlative rights of owners of land in a common source of supply of oil and gas are discussed and described in the following language:

"These existing property relations, called the correlative rights of the owners of land in the common source of supply, were not created by the statute, but held to exist because of the peculiar physical facts of oil and gas. The term 'correlative rights' is merely a convenient method of indicating that each owner of land in a common source of supply of oil and gas has legal privileges as against other owners of land therein to take oil or gas therefrom by lawful operations conducted on his own land; that each such owner has duties to the other owners not to exercise his privilege of taking so as to injure the common source of supply; and that each such owner has rights that other owners not exercise their privileges of taking so as to injure the common source of supply."

In 85 A. L. R. 1156, in discussing the case of Hague v. Wheeler, supra, the annotator states:

"* * * The fact that the owner of the land has a right to take and to use gas and oil, even to the diminution or exhaustion of the supply under his neighbor's land, does not give him the right to waste the gas. His property in the gas underlying his land consists of the right to appropriate the same, and permitting the gas to escape into the air is not an appropriation thereof in the proper sense of the term."

In like manner, the negligent waste and destruction of petitioners' gas and distillate was neither a legitimate drainage of the minerals from beneath their lands nor a lawful or reasonable appropriation of them. Consequently, the petitioners did not lose their right, title and interest in them under the law of capture. At the time of their removal they belonged to petitioner, and their wrongful dissipation deprived these owners of the right and opportunity to produce them. That right is forever lost, the same cannot be restored, and petitioners are without an adequate legal remedy unless we allow a recovery under the same common law which governs other actions for damages and under which the property rights in oil and gas are vested. This remedy should not be denied.

■ In common with others who are famliiar with the nature of oil and gas and the risks involved in their production, the respondents had knowledge that a failure to use due care in drilling their well might result in a blowout with the consequent waste and dissipation of the oil, gas and distillate from the common reservoir. In the conduct of one's business or in the use and exploitation of one's property, the law imposes upon all persons the duty to exercise ordinary care to avoid injury or damage to the property of others. Thus under the common law, and independent of the conservation statutes, the respondents were legally bound to use due care to avoid the negligent waste or destruction of the minerals imbedded in petitioners' oil and gas-bearing strata. This common-law duty the respondents failed to discharge. For that omission they should be required to respond in such damages as will reasonably compensate the injured parties for the loss sustained as the proximate result of the negligent conduct. The fact that the major portion of the gas and distillate escaped from the well on respondents' premises is immaterial. Irrespective of the opening from which the minerals escaped, they belonged to the petitioners and the loss was the same. They would not have been dissipated at any opening except for the wrongful conduct of the respondents. Being responsible for the loss they are in no position to deny liability because the gas and distillate did not escape through the surface of petitioners' lands.

We are therefore of the opinion the Court of Civil Appeals erred in holding that under the law of capture the petitioners cannot recover for the damage resulting from the wrongful drainage of the gas and distillate from beneath their lands. However, we cannot affirm the judgment of the trial court because there is an assignment of error in the Court of Civil Appeals challenging the sufficiency of the evidence to support the findings of the jury on the amount of the damages, and another charging that the verdict was excessive. We have no jurisdiction of those assignments, and, since they have not been passed upon, the judgment of the Court of Civil Appeals is reversed and the cause remanded to that court for consideration of all assignments except those herein decided. McKenzie Construction Co. v. City of San Antonio, 131 Texas 474, 115 S. W. (2d) 617; Ritchie v. American Surety Co. of New York, 145 Texas 422, 198 S. W. (2d) 85, and authorities cited.

Opinion delivered March 3, 1948.

Rehearing overruled May 12, 1948.