In re John Mills HAWN, Debtor.

AMERICAN NATIONAL
BANK, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Bankruptcy No. 90–01973–C–11.
Adv. No. 92–2034–C.

United States Bankruptcy Court,
S.D. Texas,
Corpus Christi Division.

Jan. 14, 1993.

Farley P. Katz, Matthews & Branscomb, P.C., San Antonio, TX, Margaret Knodell Hoffman, Wood, Boykin & Wolter, Corpus Christi, TX, for American Nat. Bank.

Charles Wendlandt, Office of the U.S. Atty., Corpus Christi, TX, Gregory S. Garland, Office of the U.S. Atty., Dallas, TX, for U.S.

David Herin, Corpus Christi, TX, for debtor.

Michael B. Schmidt, Corpus Christi, TX, for Chapter 11 Trustee.

OPINION AND ORDER GRANTING AMERICAN NATIONAL BANK'S MOTION FOR SUMMARY JUDGMENT ON ALL SUBSTANTIVE ISSUES

RICHARD S. SCHMIDT, Bankruptcy Judge.

Before the Court is the Motion for Summary Judgment on all Substantive Issues filed by American National Bank (the "Bank"). After hearing and argument the Court finds as follows:

## FACTS

In June 1983, Debtor John Mills Hawn ("Hawn") obtained a loan in the principal amount of $1,250,000 from Independence Bank, a California banking corporation. Hawn granted Independence Bank a security interest on certain of his oil and gas properties located in Refugio County, Texas. A single document creating this security interest was executed between Hawn and Independence Bank, and was entitled "Mortgage, Deed of Trust, Security Agreement, Assignment and Financing Statement" (hereinafter referred to as the "Security Agreement") and perfected as both a real property mortgage and a Uniform Commercial Code Article 9 security interest. Pursuant to Article III of the Security Agreement, Hawn also assigned his monthly oil and gas production to Independence Bank to be credited against the amount then due and owing on the loan, with any balance to be returned to Hawn. The assignment was effective immediately upon execution of the Security Agreement and was not conditioned upon Hawn's default. The assignment was recorded in Refugio County, Texas, on June 24, 1983.

In December 1985, American National Bank South (the "Bank") acquired Hawn's indebtedness from Independence Bank for $684,687, the then outstanding balance of the indebtedness. Independence Bank transferred to the Bank all of its rights arising under the 1983 Security Agreement. The transfer was properly recorded in Refugio County, Texas, on December 18, 1985.

In conjunction with its acquisition of Hawn's indebtedness, the Bank advanced Hawn an additional $100,000 and received a security interest on additional oil and gas properties owned by Hawn in Refugio County which were not covered by the original Security Agreement. Hawn granted the Bank a security interest in the minerals, which the Bank perfected both as a real property deed of trust and a UCC security interest, plus a present assignment of monthly production to offset against the debt. (The first and second Security Agreements will be referred to collectively as the "Security Agreements.")

On March 20, 1986, Hawn and the Bank executed a Transfer Order directing Hewit & Dougherty, the operator of Hawn's oil and gas properties, to remit all proceeds from the sale of Hawn's production to the Bank until further notice.

On September 2, 1987, the Internal Revenue Service ("IRS") filed a Notice of Federal Tax Lien in Nueces County, Texas, with respect to a 100 percent penalty for 1983 and personal income tax for 1984 allegedly owed by John Mills Hawn.

On September 2, 1987, the IRS served a Notice of Levy on Hewit & Dougherty. Hewit & Dougherty responded to the IRS that all funds due Hawn were being remitted to the Bank. During the three-year period following the issuance of that levy, Hewit & Dougherty continued to remit the proceeds from Hawn's oil and gas production to the Bank pursuant to the assignment of production clauses in the Security Agreements and the Transfer Order.

On September 18, 1987, the IRS served a Notice of Levy (Form 668–A) on the Bank. The Notice of Levy demanded the Bank pay to the IRS "all property, rights to property, money, credits, and bank deposits now in your possession and belonging to [Hawn] (or for which you are obligated) and all money or other obligations you owe this taxpayer ..." The Notice of Levy referred to the two tax liabilities for which the IRS had previously filed a Notice of Tax Lien, plus additional interest and penalties as follows:

|  | Assessment | Additions | Total |
|---|---|---|---|
| Civil Penalty (1983) | $117,468.33 | $ 7,560.51 | $125,028.84 |
| Personal Income Tax (1984) | 23,844.02 | 3,340.46 | 27,184.48 |
| TOTAL |  |  | $152,213.32 |

At the time of receipt of the levy the Bank held no funds belonging to Hawn.

The IRS served additional Notices of Levy on Hewit & Dougherty and the Bank in September 1990. On October 31, 1990, Hawn filed bankruptcy. An agreement was reached with the IRS under which all proceeds from Hawn's oil and gas production since his bankruptcy filing have been paid into this Court.

From September 18, 1987, the date the Bank received the first Notice of Levy, through October 31, 1990, the date of Hawn's bankruptcy filing, the Bank received a total of $708,567.62 from Hewit & Dougherty on account of Hawn's oil and gas production. Of this amount, $576,-888.71 was applied by the Bank against principal and interest on Hawn's outstanding loan indebtedness, $109,057.92 was remitted to Sheila Roach (Hawn's ex-wife) in accordance with a Subordination Agreement pre-existing the Notice of Tax Lien filing, $8,275.00 was applied against a debt due a third party, $8,906.14 was applied against legal fees, $55.18 was applied against miscellaneous charges, and $5,384.72 was paid to John Mills Hawn.

Shortly after it issued the 1990 Notices of Levy, the IRS first raised the argument that it was entitled to receive, under the Notices of Levy issued to the Bank and Hewit & Dougherty in 1987, all of Hawn's oil and gas production, beginning at least 45 days after the filing of the Notice of Tax Lien (*i.e.,* October 18, 1987), and continuing to October 31, 1990, the date of Hawn's bankruptcy filing.

After being advised by the IRS that it intended to bring actions against the Bank with respect to the oil and gas production, the Bank initiated this adversary proceeding. In its Complaint, the Bank requested *inter alia* that the Court determine the relative priorities of the Bank and the IRS to the oil and gas production.

The IRS filed a Counterclaim against the Bank in which it sought to enforce the September 18, 1987 levy issued against the Bank. The IRS asserted that from January 1, 1988 through September 30, 1990, the Bank received oil and gas production payments totalling $650,549.05. The IRS requested that the Court order the Bank to turn over the amount of Hawn's production payments which passed through the hands of the Bank, up to the amount levied upon.

## DISCUSSION

The dispute between the Bank and the IRS consists of two contentions. First, the IRS contends that, despite the Bank's perfected security interests in Hawn's mineral property and production, its subsequently filed IRS lien has a superior claim to the mineral production. Second, the IRS contends that after it issued Notices of Levy to the Bank, the Bank was obligated to turn over to the IRS all payments for subsequently generated mineral production from Hawn's property.

The IRS's contention that its subsequently filed lien is entitled to priority over the Bank's security interest, if accepted, would undermine the long established practices of lending based on mineral interests as security, would undermine the specific expectations of all the parties to the transactions, and would grant the IRS a windfall. The IRS's Counterclaim to enforce the levy on the Bank likewise violates long established legal principles, including the IRS's own regulations.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when the pleadings, discovery and summary judgment affidavits or declarations establish that there is not a genuine

issue as to any material fact and the moving party is entitled to judgment as a matter of law. In ruling on a motion for summary judgment, the Court will draw all reasonable inferences of fact against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

## I.

■ The priority of competitive liens on property over which there is a federal tax lien is determined by federal law. *Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). In order for a state lien to prime a federal tax lien, it must be perfected first under state law, and it must be choate as determined by federal law as of the date of the filing of the notice of the federal tax lien. *United States v. Pioneer American Insurance Co.*, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963); *United States v. New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954).

■ In Texas, oil and gas, while in the ground, is real property, but when produced becomes personal property. Here, long before any Notice of IRS Lien was filed, Hawn gave the Bank a security interest in the oil and gas both in the ground and as it is produced. The document creating the security interest was entitled "Mortgage, Deed of Trust, Security Agreement, Assignment and Financing Statement", and gave Independence Bank both a mortgage and deed of trust lien on the oil and gas while in the ground and a security interest, protected under the UCC, in the oil and gas when produced. That Security Agreement was duly filed in Refugio County on June 24, 1983. Independence Bank transferred its security interest to American Bank by a document captioned "Transfer of Lien", which was also filed in the Deed Records of Refugio County on December 18, 1985. A similar Security Agreement was executed and filed with respect to the additional $100,000.00 lent to John Mills Hawn.

The Security Agreements gave the Bank a perfected, first priority security interest in the oil and gas while in the ground.

Those documents also gave the Bank a perfected first priority security interest in any oil and gas produced from that property. *See* UCC § 9.401(a)(2), providing that a security interest in minerals, including oil and gas, is to be perfected by filing the security agreement in the office of the County Clerk in the county where a mortgage on the real estate would be filed or recorded.

The IRS concedes that the Bank held a first priority security interest in the oil and gas while it was in the ground. The IRS, however, contends that by virtue of its subsequently filed Notice of Tax Lien, it had a first priority security interest in the oil and gas as produced.

■ Internal Revenue Code Section 6323(a) provides that a federal tax lien is not valid against a previously existing "security interest." Under Texas law a mineral owner has absolute title to the oil and gas in place beneath his land. *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558 (1948). As the Texas Supreme Court stated in *Elliff*, "Each owner of land owns separately, distinctly and exclusively all the oil and gas under his land...." 210 S.W.2d at 561. *See also* 55 Tex.Jur.3d, Oil and Gas (1987) § 9 at 32. Oil and gas in the ground thus is precisely the same property as oil and gas after extraction. The property is merely in a different location. The oil and gas underlying Hawn's property was therefore in existence and was owned by Hawn as of the dates the Security Agreements were executed, and before the IRS's Notice of Tax Lien was filed. The rule of capture in no way undermines this conclusion. Under the rule of capture, an adjoining landowner may appropriate the oil and gas which flows from underneath a neighbor's land without incurring liability. Until appropriation by drainage occurs, however, the landowner remains the absolute owner of the oil and gas under his property. *See Stephens County v. Mid–Kansas Oil & Gas Co.*, 113 Tex. 160, 254 S.W. 290, 292 (Tex.1923), expressly rejecting the contention that the possibility of capture negates ownership of oil and gas in place.

Hawn thus had full vested title to the oil and gas in the ground. The fact that Hawn's title to that oil and gas might possibly be divested by capture in no way changes that fact. Indeed, it is true that one could be divested of title to many types of property one owns. For example, cash could be stolen from someone and title passed to an innocent holder, property could be condemned by the state or lost by adverse possession, personal property entrusted to a dealer in such property could be sold to innocent purchasers (see UCC § 2.403(b)), or land may be lost to an adjacent land owner by erosion. The fact that Hawn might conceivably *lose* title to some of the oil and gas in the ground under the rule of capture in no way alters the fact that he had a vested ownership interest in that oil and gas in place. *Stephens County v. Mid–Kansas Oil & Gas Co., supra.*

Under I.R.C. § 6323(a) a holder of a "security interest" takes priority over a federal tax lien if the security interest is in existence prior to the time that the tax lien is perfected by a Notice of Tax Lien filing. Section 6323(h) defines a security interest as "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation ..." Section 6323(h) contains no reference whatsoever to the word "attachment", and does not make the existence or validity of a security interest dependent on "attachment". Rather, that section imposes the following requirements for a security interest to exist:

   a. The property must be in existence;

   b. The interest must be protected under local law against a subsequent judgment lien arising out of an unsecured obligation; and

   c. The holder of the security interest must have parted with money or money's worth.

All of the requirements of § 6323(h) were met in this case prior to the IRS's Notice of Tax Lien filing. The Bank accordingly has priority to the proceeds of the production under § 6323(a).

■ Under Texas law where a creditor has a security interest which is perfected both as a deed of trust on the minerals in the ground and perfected under Article 9 after extraction, as here, the resulting interest is a single continuous security interest that attaches while the minerals are in the ground and continues after extraction. *See In re Hess,* 61 B.R. 977 (Bankr. N.D.Tex.1986). Accordingly, the Bank's Security Agreements, which were properly filed and which cover the oil wherever it may be, each created a single, continuous lien which attached while the minerals were in the ground and persisted through their production. The Bank's security interest consequently is superior to the IRS' tax lien.

The principle set forth in *In re Hess* is well established. *See* Vagts, "The Uniform Commercial Code and the Oil and Gas Mortgage", in 1C *Matthew Bender's Uniform Commercial Code,* Ch. 16B. There, the author notes that in jurisdictions such as Texas, which treat oil and gas in place as real property, "there is a real estate lien on the oil and gas up to the moment when it is extracted—*then it is converted into a Code security interest." Id.,* § 16.15[8] at page 1746, emphasis added.

Moreover, the Texas Legislature has confirmed this in an amendment to UCC § 9.203(c). As revised, that section provides that "[i]f a secured party holds a security interest which applies under this chapter to minerals (including oil and gas) upon their extraction and the security interest also qualifies under applicable law as a lien on such minerals before their extraction, the security interest before and after production shall constitute a single continuous and uninterrupted lien on the property." UCC § 9.203(c). Although this provision was enacted in 1991, the statute expressly provides that it "[i]s declaratory of the law of the state as it has heretofore existed and shall apply with respect to oil, gas and other minerals heretofore and hereafter produced." *Id.*

Several federal courts, including the Fifth Circuit, have rejected the security interest interruption theory in cases involving insurance proceeds. In *PPG Industries, Inc. v. Hartford Fire Ins. Co.,* 531

F.2d 58 (2d Cir.1976), the Second Circuit held that a security interest in insured property, which under state law also attached to insurance proceeds on that property, was valid over a federal tax lien filed after the security interest, but before the proceeds were generated. The IRS conceded, as here, that the creditor's lien would be good against other private claimants, but contended that the lien could not attach until those proceeds came into existence, at which time the IRS had already on file a prior tax lien. The court, however, rejected this "attachment" argument. Looking to state law, the Second Circuit concluded that "the proceeds of the insurance are merely the collateral in another form", and consequently held that the creditor's security interest was superior to the federal tax lien. *Id.* at 62.

The Fifth Circuit, in *Paskow v. Calvert Fire Ins. Co.*, 579 F.2d 949 (5th Cir.1978), has adopted the Second Circuit's holding in *PPG Industries, Inc.* Accord, *Aetna Ins. Co. v. Thermal Industries, Inc.*, 591 F.2d 1035 (5th Cir.1979). In *Paskow* the government argued that the creditor's lien could not "attach" until the proceeds came into existence. Following the Second Circuit's opinion in *PPG Industries*, however, the Fifth Circuit held "we regard the insurance fund and the original collateral as one and the same property for the purpose of determining when the property came into existence." 579 F.2d at 954. Accordingly, the Fifth Circuit held that the creditor's security interest on the insured property and the proceeds of that property was superior to the federal tax lien.

The Bank's position here is even stronger than the creditor's position was in *Paskow*. *Paskow* involved insurance proceeds, which differ from the underlying insured collateral, yet the Fifth Circuit held they would be treated as one and the same property for purposes of determining the priority of the creditor's lien. In the subject case, while the character of the property may change from real to personal, the minerals are the same minerals. Oil in the ground and oil produced is one and the same property. *In re Hess* and *Elliff v. Texon Drilling Co.*, *supra*.

## II.

■ In its Counterclaim against the Bank, the IRS asserts that the Bank failed to honor the levy served on it on September 18, 1987 in an amount of $152,213.32. The IRS asserts that from January 1, 1988 through September 30, 1990, $650,549.05 of royalty payments were received by the Bank representing mineral production on Hawn's property. The IRS contends, therefore, that under Section 6332(d)(1) of the Internal Revenue Code, the Bank should have paid over to the Government all royalties received from Hawn's property following the notice of levy in 1987 up to the amount of that levy.

Under Section 6331(a) of the Internal Revenue Code, the IRS is authorized to levy upon all property and rights to property (except property exempt by statute) belonging to a delinquent taxpayer. The notice of levy served on the Bank directed the Bank to turn over to the IRS "all property, rights to property, money, credits and bank deposits now in your possession and belonging to [Hawn] (or for which you are obligated) and all money or other obligations you owe this taxpayer)."

An IRS levy, however, reaches *only* property which exists on the date of the levy. Thus, the Treasury Regulations provide that, except with respect to levies on salary or wages (as to which the Internal Revenue Code specifically authorizes a continuing levy), "[a] levy extends *only* to property possessed or obligations which exist at the time of the levy." Reg. § 301.-6331(a)(1), emphasis added.

■ Under the Regulations, an IRS levy also will reach a vested, accrued right to receive money in the future. The Regulations then provide that an IRS levy will reach property "when the liability of the obligor is *fixed and determinable* although the right to receive payment thereof may be deferred until a later date." *Id.*, emphasis added. This would cover, for example, a note providing for specific payments on fixed future dates.

In contrast, an IRS levy will *not* reach a taxpayer's claim to receive payments in the future where the taxpayer does not, at the time of the levy, have a fixed and determinable right to those payments. For example, the IRS has ruled that a levy will *not* reach unvested, contingent rights to future payments. *See* Rev.Rul. 75-554, 1975-2 C.B. 478. There, the IRS considered a levy served on a corporation after it had declared a dividend, but before the record date for payment of that dividend. The IRS noted that, although the stockholder as of the dividend declaration date "may become a creditor of the corporation", he does "not acquire a vested property right to the dividend" until the record date. Accordingly, the IRS ruled that a levy served on the corporation on the dividend declaration date and prior to the record date would not reach the dividend, since the stockholder did not have a vested right to the dividend.

Similarly, the example in the Regulations stating that an IRS levy will reach future payments due under completed sales of personal property implies that an IRS levy will *not* reach amounts to be received in the future for sales of personal property that have not yet occurred.

Finally, prior to a statutory amendment expressly authorizing a continuing levy on wages (now I.R.C. § 6331(e)), the courts had uniformly held that a levy will not reach a taxpayer's right to payment for services to be rendered after service of the levy, since the taxpayer had no presently vested right to such payments. *See United States v. Long Island Drug Co.,* 115 F.2d 983, 986 (2d Cir.1940) (IRS levy cannot reach taxpayers' future earnings, since they "are contingent upon performance of a contract of service and represent no existing rights of property."); *United States v. Penn,* 266 F.Supp. 655 (Ariz.1967) (same); *United States v. Newhard,* 128 F.Supp. 805 (W.D.Pa.1955) (same). *See also Wagner v. United States,* 573 F.2d 447, 454 (7th Cir.1978) ("Haughton's future wages and commissions were contingent on his continued employment and thus did not represent an existing property right to which a lien could attach. Haughton had no present right to the wages and commissions.")

Here, Hawn, by means of the Transfer Order, had directed the operating company to pay any future revenues that might be generated from mineral production to the Bank. The right to receive revenues that might be generated from future production from Hawn's property was not a vested, fixed or determinable right to future income existing at the time of the levy. Rather, that income stream represented a purely contingent right to receive certain income in the future. That right was contingent, among other things, on (1) whether minerals were produced, (2) the amount of such production, (3) whether and when the minerals were sold, (4) the sale price for the minerals, and (5) the expenses incurred in generating such production.

Since the right to receive future income from production and sale of oil thus was a contingent, non-vested and non-determinable right, the IRS levy could not reach it. *See United States v. Long Island Drug Co., supra.;* Rev.Rul. 77-554, *supra.*[1]

## CONCLUSION

There are no genuine issues of material fact and the Bank is entitled to summary judgment as a matter of law on the substantive issues presented in this case. The IRS's Counterclaim against the Bank should be dismissed.

Accordingly, IT IS HEREBY ORDERED that the Motion for Summary Judgment of the American National Bank is hereby GRANTED.

It is FURTHER ORDERED that the Motion of the United States is DENIED.

[redacted]

1. The IRS contends that it is inconsistent to argue that the lien is choate but the right to income from production is contingent. The lien is not contingent because it does not depend upon any further action. The Bank's right to receive income is, however, contingent in that it depends upon production and sale of the minerals. Obviously the lien is not the same as the right to income.