NO. 07-07-0009-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



OCTOBER 26, 2007


______________________________



DANIEL GUERRERO, 



 Appellant


v.



THE STATE OF TEXAS, 



 Appellee

_________________________________



FROM THE 72ND DISTRICT COURT OF CROSBY COUNTY;



NO. 2940; HON. RUBEN G. REYES, PRESIDING


_______________________________



Memorandum Opinion


_______________________________



Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

 Daniel Guerrero was convicted of murder. In appealing that conviction, he contends
the evidence is legally and factually insufficient to support it. We disagree and affirm the
judgment. 

 Background

 On the night of January 9, 2005, around 9:00 p.m., Victoria Barron heard a knock
at her front door. Barron as well as her cousin JoAnn Mendoza and Mendoza's boyfriend
Abel Reyna walked out the back door and proceeded around the side of the house to see
who was there. A man later identified as appellant asked if a person named LaLa Robledo
lived there. Barron replied that he did not. Barron and appellant shook hands and
continued a conversation in Spanish. Appellant then left, and the others went back inside
the house.

 Mendoza and Reyna later left to get something to eat. While they were gone, there
was another knock at the door. Barron went to the back porch to speak with the person. 
Barron's boyfriend Ricky Perez also went outside after a short time and observed Barron
in conversation with appellant. Perez became jealous and told appellant to leave which
he did. At approximately 9:45 p.m., Mendoza and Reyna returned to the house to let
Mendoza's children out, and they noticed Barron talking outside to appellant. Reyna
believed Barron and appellant were having an argument. However, appellant left at that
time. 

 Later, Mendoza and Reyna returned from the store and re-entered the house. 
There was then another knock at the back door. Barron went out alone to see who it was
and closed the door behind her. After some period of time, when Barron did not return, the
others went to check on her and found her lying in blood in the back yard. She had been
stabbed with a knife which had been driven through her skull. The knife handle had been
broken off and was never recovered. Barron later died from the knife having severed her
brain stem and vertebral arteries.

 After receiving a description of appellant, law enforcement persons arrested him a
short time later walking down the highway about one and one-half miles from the scene. 
He had blood from a cut on his finger and stains on his clothing that appeared to be from
blood. He was also determined to be intoxicated. 

 Legal Sufficiency

 The standard by which we review the legal sufficiency of the evidence is well
established. We refer the parties to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61
L.Ed.2d 560 (1979) and Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). 

 The mere presence of an accused at or near the scene of a crime standing alone
is insufficient to establish his guilt. King v. State, 638 S.W.2d 903, 904 (Tex. Crim. App.
1982); Robertson v. State, 888 S.W.2d 493, 495 (Tex. App.-Amarillo 1994, pet. ref'd).
However, it is a circumstance from which a factfinder may draw an inference of guilt when
combined with other facts. Mabra v. State, 997 S.W.2d 770, 774 (Tex. App.-Amarillo
1999, pet. ref'd). At bar, no witness saw the person who knocked at the back door the last
time before Barron was stabbed. There is only evidence that appellant was at the house
more than once earlier in the evening. Furthermore, DNA evidence was not able to confirm
that appellant's blood was on Barron or that her blood was on him. 

 Nevertheless, there was some other evidence of appellant's guilt in that no one had
observed appellant bleeding (particularly when he shook hands with Barron) when he had
been at the house earlier, and the medical examiner testified that, because of the
placement and force of the stabbing, the perpetrator could have sustained a cut to the
hand or fingers. Furthermore, two fellow jail inmates testified they had heard appellant
state that he had thrown the knife handle and one of the two shirts he was wearing into a
garbage can or dumpster. 

 This evidence, taken in the light most favorable to the verdict, is sufficient to allow
a rational factfinder to determine beyond a reasonable doubt that appellant committed the
offense. Thus, the evidence is legally sufficient to sustain the verdict.

 Factual Sufficiency

 The more difficult question is whether the evidence is factually sufficient. The
standard by which we make that determination is found in Watson v. State, 204 S.W.3d
404 (Tex. Crim. App. 2006) to which we refer the parties. 

 Although Reyna believed that Barron and appellant had been arguing, no one else
reported the same, and Reyna's testimony was based only on "how they were all moving
around." There was also nothing to indicate that he had told that fact to anyone before
trial. Moreover, no explanation was provided for any alleged argument because there was
no evidence that appellant and Barron knew each other prior to that evening. The medical
examiner was also unable to positively state that the assailant had cut his hand during the
stabbing, and there was no evidence that appellant possessed a knife. 

 As to the fellow inmates who overheard appellant say that he had thrown one of his
shirts away, appellant was wearing two shirts at the time he was picked up by police, and
several witnesses testified he was dressed the same when they saw him later that night
at the police station as he had been at Barron's house. Some of the visitors at Barron's
house that evening were also inconsistent as to the description of appellant and the timing
of certain events. 

 While the evidence of appellant's presence at Barron's home and the cut on his
hand would not be enough by itself to sustain his conviction, it is some evidence from
which an inference may be drawn and, when combined with the alleged confession
reported by appellant's fellow inmates, we cannot say that a rational jury could not have
found appellant guilty. Admittedly, the credibility of the inmates who reported the
confession was attacked. However, they knew that the knife handle had been broken off,
and there was no evidence of any motive or gain they achieved by their testimony. So, it
was for the jury to determine their credibility and assign weight to their testimony. In sum,
while the evidence of appellant's guilt is certainly not overwhelming, it is not so completely
lacking so as to undermine our confidence in the proceeding. 

 Finally, we note appellant's reference to Zimmerman v. State, 753 S.W.2d 234 (Tex.
App.-Amarillo 1988, no pet.) and Skelton v. State, 795 S.W.2d 162 (Tex. Crim. App.
1989). Neither involved fellow inmates overhearing the accused discuss how he
purportedly disposed of various incriminating items. That circumstance appears here,
however. And, if their testimony is believed (something the jury opted to do), that evidence
directly ties appellant to the murder.

 The evidence of appellant's guilt is both legally and factually sufficient, and the
judgment is affirmed.


 Brian Quinn

 Chief Justice

Do not publish. 



as based on what the protection well would have produced as
opposed to the amount of gas drained which, Kerr-McGee argues, is the proper measure
of damages. The motion was denied. Later, Riley was recalled to testify as to the amount
of drainage. Before cross-examining Riley, Kerr-McGee moved again to strike his
testimony on the basis that there were no facts to support the opinion. The court remarked
that Kerr-McGee had already allowed Riley to render his opinion. Riley then gave
additional testimony as to how he arrived at his opinion, and the court overruled the motion
to strike. Kerr-McGee also failed to object to the admission of Plaintiff's Exhibit 21, which
is an analysis of the royalty cash flow that would have resulted from production from the
protection well if drilled. 

 Appellees rely on Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402 (Tex.), cert.
denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998), for the proposition that in
order to preserve a complaint that expert evidence is unreliable and therefore no evidence,
a party must object to the evidence before trial or when the evidence is offered. Such a
statement was made by the Maritime court on the basis that, without a timely objection, the
offering party was not given an opportunity to correct any defect in the testimony. Id. at
409. However, in Maritime, the reliability of scientific evidence presented by five experts
was not objected to until after the jury verdict, and the court found that the complaint could
not be initially made at that late time. Id. at 411. 

 As a prerequisite for presentation for review, the record must show that the
complaint was made to the trial court by a timely request, objection, or motion. Tex. R.
App. P. 33.1(a)(1); Tex. R. Evid. 103. To be timely means that the objection must be
made, if possible, before the evidence is admitted or, if not possible at that time, objection
must be made as soon as the ground of objection becomes apparent. Land v. State, 890
S.W.2d 229, 234 (Tex.App.--Beaumont 1994, no pet.). Error is also waived when
testimony to the same effect has been admitted without objection. Ramirez v. H.E. Butt
Grocery Co., 909 S.W.2d 62, 69 (Tex.App.--Waco 1995, writ denied). 

 Kerr-McGee argues that the unreliability of Riley's opinions was disclosed only after
cross-examination. Therefore, its motion to strike was timely. Even so, Kerr-McGee still
allowed the admission of Exhibit 21, which formed the substance of Riley's opinion with
respect to the amount of damages, without objection. Kerr-McGee conceded in oral
argument that it could have taken Riley on voir dire at the time Exhibit 21 was offered, as
it did with respect to at least two other exhibits, to determine whether the exhibit was
objectionable, but did not do so because that voir dire would have allegedly lasted a
considerable amount of time. However, in Welch v. State, 993 S.W.2d 690, 694 (Tex.App.
--San Antonio 1999, no pet.), it was held that a statement of "no objection" at the time that
DNA test results were offered into evidence waived the defendant's complaint that the DNA
expert deviated from protocol and lacked the expertise to sponsor the evidence. Id. at 694.

 Nevertheless, this was a non-jury trial in which the concerns of keeping inadmissible
evidence outside the purview of the jury are not present. We also recognize that some
cross-examination may have been required before objections to the unreliability of Riley's
opinions became apparent. Furthermore, Kerr-McGee moved to strike the testimony at the
end of its cross-examination of Riley and at each appropriate opportunity thereafter. 
Therefore, we do not believe that Kerr-McGee waived its objection in this instance. 

 We must therefore consider whether Riley's testimony as to damages was based
on a reliable factual foundation. Although Kerr-McGee does not challenge Riley's
credentials, we note that he had a degree in petroleum engineering from the University of
Texas and had worked as a petroleum engineer and reservoir engineer for Tenneco Oil
Company and Cotton Petroleum. He had also been exploration manager for Natural Gas
Anadarko and Courson Oil and Gas in Perryton, Texas. During that time, approximately
75% of his work was in the Texas Panhandle and approximately 99% was in the Anadarko
Basin. 

 Riley testified that there were approximately 20.25 billion cubic feet of gas contained
in the reservoir being produced by the Holmes 17-1 well. That figure was based on
production from the well from January 1, 1994, through October 1994, as well as the
bottom hole pressure readings from the well and use of the Z factor to correct for deviation
from the ideal gas. Riley estimated that 17 billion cubic feet of gas were recoverable, but
only 14 billion cubic feet were still recoverable as of February 1, 1995. He prepared Exhibit
21, which was an analysis of the royalty cash flow from the hypothetical protection well
producing by February 1, 1995. The gas prices were obtained from the comptroller's office
as the prices for gas sold from the Holmes 17-1 well and the Fleetwood Trust 16-1 well,
and the royalty interest was based on the interest in the oil and gas leases. The volumes
of gas were derived from a production forecast made by Riley using the rate of production
from the Holmes well and the production from other wells in the immediate area.

 Later, Riley was recalled to testify as to the amount of gas drained from the Lower
Puryear formation under Section 10. He estimated that, as of the beginning of 2001,
approximately 3.1 billion cubic feet of gas had been drained. The amount drained by the
end of October 1996 was 1.3 billion cubic feet, and the amount drained by January 1,
1999, was 2.6 billion cubic feet. Those figures would have included drainage that occurred
prior to February 1, 1995, the date by which plaintiffs claimed an offset well should have
been producing. Riley made those calculations by looking at the cumulative production
from the field at a particular period of time and obtaining a bottom hole pressure over Z
factor and comparing that to the original bottom hole pressure over Z factor to determine
the percentage of gas depleted. He admitted that he had done no calculation as to how
much gas the Holmes 17-1 well alone had drained as opposed to drainage also caused
by the Fleetwood well. 

 Kerr-McGee relies on the following testimony to support its proposition that there is
no reliable factual foundation for Riley's opinions as to the amount of damages:

* * *


 Q. (By Mr. Morris) Now then, I am searching for any provable fact, a fact as
to which you have proof upon which you can base your opinion as to the
productivity of the hypothetical well. 


 A. I do not know the productivity of the hypothetical well.


 Q. But that's what you based your entire damage calculations on in this
case, is that that well would have produced 6.1 BCF of gas had it been
drilled and commenced production as of February 1, 1995, isn't it?


 A. Yes, I did.


 Q. And you have absolutely no factual data upon which to support that
opinion, do you Mr. Riley?


 A. There are - the only fact I have to base that on is what the wells in the
immediate area are producing.

 

 Q. Okay. And that does not tell you what the hypothetical well would have
produced, does it?


 A. No, it does not. 


 Q. All right. So back to my statement a moment ago, and to be completely
honest, and I think you are, that you simply do not have any factual basis for
projecting the production of that hypothetical well, do you?


 A. That is correct.


 Q. Okay. It's purely unsupported assumption, or estimation, isn't it?


 A. No.


 

 As already noted, Exhibit 21 was admitted without objection. Prior to its admission,
Riley testified that he employed engineering principles in projecting the income from the
protection well and that the figures on the exhibit had a sound basis in engineering
principles. Exhibit 16 was also admitted without objection. It was a production forecast for
the protection well and was the basis for the calculations in Exhibit 21. It showed the
hypothetical well going on production in February 1995, at a rate of approximately 8 million
cubic feet of gas a day, which was the rate at which the Holmes well was producing at that
time. The rate of production declined to 4 million cubic feet of gas a day in February 1997,
at which time the Fleetwood well went on production. Riley used the production and
pressure of the neighboring wells to make his calculations as to the production of the
hypothetical well. He testified that the amount of gas or the pressure that has been drawn
down in the average reservoir at any point in time can be determined by looking at the
cumulative production from the field at that time and comparing the bottom hole pressure
over Z factor and comparing it to the original bottom hole pressure over Z factor.

 In Southeastern Pipe Line Co. v. Tichacek, 977 S.W.2d 393, 399-400 (Tex.App.--
Corpus Christi 1998), rev'd on other grounds, 997 S.W.2d 166 (Tex. 1999), there was
testimony as to the probable returns of the hypothetical offset wells, which must have
necessarily included an opinion as to production from those wells, that was sufficient to
support the measure of damages found by the jury. Id. at 399-400. Thus, while Riley's
opinion may not be absolute, we believe there is some factual basis to support his opinion
as to the amount of damages. The determination as to the credibility of that opinion is to
be made by the trier of fact. Kerr-McGee's first issue is overruled.

 In its second issue, Kerr-McGee complains that the trial court erred in denying its
motions for judgment and to reform the judgment because there is no competent evidence
to support an award of damages or to support the award made by the court. Although
Kerr-McGee still complains that Riley's testimony is incompetent, which we have
addressed under Kerr-McGee's first issue, Kerr-McGee also argues that even if the
testimony as to damages is competent, there is no evidence to support the court's findings
of damage. The trial court found damages in the amount of $840,910.51 measured by the
royalties appellees would have received from a timely-drilled protection well for the period
beginning February 1, 1995, and ending March 16, 2001. The court further found
damages in the amount of $22,738.85 measured by the royalties appellees would have
recovered from a timely-drilled protection well for the period beginning March 17, 2001,
through the time of depletion of all recoverable reserves. 

 While appellees argue that the correct measure of damages is the royalties on the
amount of gas drained from Section 10 as opposed to the royalties on the amount of gas
a protection well would have produced, they do not specifically claim it as an issue in their
appeal. Instead, they argue there is no evidence under either measure of damages to
support an award with reasonable certainty. Because Kerr-McGee did not specifically
assign as error the measure of damages used by the trial court, we lack the authority to
pass on the propriety of the same. Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d
558, 560 (1948). Moreover, while there may be some conflict as to the proper measure
of damages, there is authority in Texas to support the measure of damages used by the
trial court. See Tichacek, 977 S.W.2d at 399-400; Shell Oil Co. v. Stansbury, 401 S.W.2d
623, 628-29 (Tex.Civ.App.--Beaumont 1966, writ ref'd n.r.e.). 

 In determining a "no evidence" or legal sufficiency challenge, we examine the record
for any probative evidence which, when viewed in its most favorable light, supports the
judgment, and we disregard all contrary evidence. Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965). If damages can be estimated with reasonable certainty, the amount is left
to the trier of fact. Bildon Farms, Inc. v. Ward County Water Imp. Dist. No. 2, 415 S.W.2d
890, 896-97 (Tex. 1967); Guardian Trust Co. v. Brothers, 59 S.W.2d 343, 346
(Tex.Civ.App.--Eastland 1933, writ ref'd). However, the factfinder may not assess an
amount neither authorized nor supported by evidence, and there must be a rational basis
for the calculation. First State Bank v. Keilman, 851 S.W.2d 914, 930 (Tex.App.--Austin
1993, writ denied). 

 In this instance, the only evidence presented by appellees in support of the amount
of damages came from Riley. We have already discussed that testimony in some detail
and will not do so again. 

 Kerr-McGee also presented Ronald Platt, a consulting petroleum engineer who had
previously worked for Chevron Oil Company, who prepared an exhibit which showed that
the royalty value of the recoverable gas in place in the Lower Puryear reservoir in Section
10 was $120,000 based on .4 billion cubic feet of gas originally in place and an assumed
80% recovery factor. The amount of gas originally in place was based on an isopach map
prepared by an employee of Kerr-McGee, who was a managing geologist. 

 The trial court stated in its findings of fact and conclusions of law that the award of
damages was based on what the hypothetical well would have produced. Exhibit 21
detailed by month the net royalty income and cumulative income from February 1995,
through December 2004 that the hypothetical well would have produced. However, the
amount of $840,910.51 awarded by the trial court for the period from February 1, 1995
through March 16, 2001, does not appear anywhere on that exhibit. The closest amount
is $849,775, which was the cumulative royalty income through May 1996. Neither side has
offered an explanation as to how the trial court arrived at its award. 

 Appellees argue that because the damages awarded by the trial court fall within the
range of Riley's damage calculations, the trial court's award is supported by the evidence. 
In advancing that position, they rely on Howell Crude Oil Co. v. Donna Refining Partners,
Ltd., 928 S.W.2d 100 (Tex.App.--Houston [14th Dist.] 1996, writ denied). In Donna, the only
evidence in support of lost profits came from one expert, who presented a calculation of
a refinery's total net income of $300,000 for a six-month period. Instead, the jury awarded
an amount of $174,110. Id. at 107. The court concluded that while it was not clear how
the jury arrived at the figure awarded, a trier of fact has the discretion to award damages
within the range of evidence presented at trial. Id. at 108. Given various flaws in the
calculations as pointed out by the defendant, the jury could have concluded that a lesser
amount was appropriate. Id. 

 In response, Kerr-McGee, while recognizing the Donna opinion, contends that the
factfinder cannot arbitrarily pull a number out of a hat, i.e., there must be a rational basis
for the calculation and relies on Keilman. In that case, the jury found that First State Bank
charged $360 in unauthorized interest in a demand letter. Keilman, 851 S.W.2d at 929. 
The Keilmans presented evidence at trial that $7,161.44 was excess interest charged,
while First State Bank presented evidence that $169.92 was demanded in interest. Neither
party could explain how the jury arrived at its decision. Therefore, the court determined
that the jury's finding was inexplicable in light of the evidence presented at trial, and that
no rational basis existed for the jury's calculation except that it fell between the Keilmans'
figure and First State Bank's figure. Id. at 931. Since the evidence provided a relatively
precise method for calculating the interest, the evidence presented was insufficient to
support the jury's finding. Id. 

 The factfinder does not have to unquestioningly accept the testimony of an expert,
but may reduce the amount of damages based on challenges to the expert's opinion. See
America's Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 629 (Tex.App.--San Antonio
1996, writ denied). The factfinder also may consider conflicting expert testimony and blend
the testimony to arrive at a verdict. Knox v. Taylor, 992 S.W.2d 40, 62 (Tex.App.--Houston
[14th Dist.] 1999, no pet.); Lindgren v. Delta Investments., 936 S.W.2d 422, 425 (Tex.App.--
Austin 1996, writ denied). 

 In this instance, there was evidence that it may not have been reasonable to
assume, as did Riley, that a hypothetical offset well would have produced at the same rate
as the Holmes 17-1 well and later at the same rate as the Fleetwood 16-1 well, which
began production in 1997 from the same reservoir. Riley conceded that the Holmes and
Fleetwood wells had different thicknesses and actually produced at different rates. The
Fleetwood well actually produced at a much higher rate than the Holmes well. Further,
there was evidence that Riley did not use the production figures of the Holmes well as
those of the hypothetical well in the preparation of Exhibit 21. Therefore, the trial court
could have reasonably concluded that some lesser amount of production would have
occurred from a hypothetical well than that presented by appellees. The award of
damages was within the range presented by the experts and is sufficient to uphold the
award. Kerr-McGee's second issue is overruled.

 In its third issue, Kerr-McGee complains that there is no evidence and no findings
to support the award of prejudgment interest in the amount of $190,068.75 on the
damages award of $840,910.51. Kerr-McGee concedes that normally in a breach of
contract suit, the plaintiff is entitled to prejudgment interest from the date suit was filed if
no notice was given prior to filing suit as in this instance. See Johnson & Higgins of Texas,
Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 530-31 (Tex. 1998). However, Kerr-McGee
asserts three reasons why the same rule should not apply in this case: 1) Johnson &
Higgins involved a single breach of contract and one amount of damages which accrued
long before the lawsuit was filed; 2) damages resulting from drainage accrue on a month-to-month basis, and they had not all accrued before suit was filed; and 3) the court did not
specify an amount of damages that had accrued as of January 8, 1999, the date suit was
filed, or make any findings of monthly accruals. Thus, Kerr-McGee posits, there is clearly
no basis for calculating prejudgment interest. 

 In Johnson & Higgins, the court found that prejudgment interest on a breach of
contract claim falls under the common law, but that common law prejudgment interest shall
begin to accrue on the earlier of 180 days after the date a defendant receives written notice
of a claim or the date suit is filed in accordance with the provisions of article 5069-1.05 §
6(a) of the Texas Revised Civil Statutes, which applies to wrongful death, personal injury,
and property damage cases. Id. at 530-31. Thus, common law and statutory prejudgment
interest were made consistent with one another. 

 Kerr-McGee cites Black Lake Pipe Line Co. v. Union Const. Co., Inc., 538 S.W.2d
80, 95 (Tex. 1976) and Phillips Petroleum Co. v. Stahl Petroleum Co., 569 S.W.2d 480,
488 (Tex. 1978), for the proposition that prejudgment interest may only be awarded where
damages are established as of a definite time and the amount is definitely determinable. 
In Union, the recovery sought was the costs of extra work performed under a construction
contract, which were due and owing as of the date of acceptance of the work. Therefore,
the court was not required to address the issue raised by Kerr-McGee in this appeal as to
damages that will accrue in the future. Similarly, in Stahl, the sums owed to Stahl
Petroleum Company were monthly payments for the purchase of gas under a gas
purchase contract which Phillips Petroleum Company had held and used without consent
pending Federal Power Commission approval of interstate gas prices. Thus, all of the
sums owed had accrued by the date suit was brought and the question before us was once
again not at issue.

 Although Johnson & Higgins may have involved one amount of damages that
accrued before suit was filed, it was noted that the scope of recoverable interest may 
include future damages awarded as part of the judgment. Johnson & Higgins, 962 S.W.2d
at 530. Furthermore, prejudgment interest on damages for drainage was approved by the
court in Tichacek, 977 S.W.2d at 401-02. Therefore, we see no reason why appellees are
not entitled to recovery in this instance. 

 Nevertheless, Kerr-McGee argues that there is no evidence to support an award of
prejudgment interest because the court made no findings as to the amount of damages as
of January 8, 1999. The trial court's findings of fact show that the court calculated
prejudgment interest on $840,910.51 from January 8, 1999, the day suit was filed. Thus,
the court's judgment was in accordance with the law, and it was not necessary for the court
to make a specific finding as to how much in damages had occurred as of the date suit was
filed. Kerr-McGee's third issue is overruled.

 In summary, all of the issues are overruled, and the judgment of the trial court is
affirmed.


 John T. Boyd

Publish. Chief Justice
1. Kerr-McGee Corporation assigned the leases which are the subject of this lawsuit
to its subsidiary, Kerr-McGee North American Onshore Corporation, and later there was
a merger with Devon Energy Corporation (Nevada), after which the entity became Devon
Energy Production Company, L.P.
2. The appellees include 69 individuals, estates, and trusts.