# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2014

Lyle W. Cayce
Clerk

No. 13-20307

BRETON ENERGY, L.L.C.; CONN ENERGY, INCORPORATED,

Plaintiffs – Appellants

v.

MARINER ENERGY RESOURCES, INCORPORATED, formerly known as Mariner Energy, Incorporated, formerly known as Forest Energy Resources, Incorporated; FOREST OIL CORPORATION; CHEVRON CORPORATION; CHEVRON U.S.A., INCORPORATED; UNOCAL CORPORATION; UNION OIL COMPANY OF CALIFORNIA; CHEVRON CORPORATION, doing business as Union Oil Company of California; UNION OIL COMPANY, doing business as Unocal; PURE RESOURCES, L.L.C.; IP PETROLEUM COMPANY, INCORPORATED; INTERNATIONAL PAPER COMPANY; APACHE CORPORATION; APACHE SHELF, INCORPORATED,

Defendants – Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, GARZA, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Well-pleaded factual allegations may perfectly shield a complaint from dismissal under Rule 12(b)(6), and our inquiry's "emphasis on the plausibility of a complaint's allegations does not give district courts license to look behind those allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011). Because Appellants successfully plead

No. 13-20307

a claim for relief against Appellee IP, but not the other Appellees, we AFFIRM in part and VACATE in part and REMAND.

## FACTS AND PROCEEDINGS

Conn Energy, Inc. ("Conn") owns a mineral lease named West Cameron 171 ("WC 171") that is located in the Gulf of Mexico.[1] In 2009, Conn executed an agreement with Breton Energy, LLC ("Breton") that permits Breton to explore WC 171 for hydrocarbons. Conn and Breton (collectively, "Appellants") are suing the owners and operators of a neighboring lease named West Cameron 172 ("WC 172"). Apache[2] operates and is an interest owner in WC 172's northern half. Apache is Mariner's[3] successor-in-interest. Before Mariner, IP,[4] Pure,[5] and Forest[6] all operated and owned interests in WC 172's northern half. Significantly, WC 171 and WC 172 share a hydrocarbon reservoir named the K-1 sands.

In 2010, Breton and Conn planned to reenter a well on WC 171. They targeted the K-1 sands; specifically, an area known as the "Upper Cib Op Zone." Before reentering the well, Breton and Conn requested records from the Minerals Management Service ("MMS").[7] MMS records revealed that a well had been completed[8] in 1999 in the K-2 sands and in a lower zone called the

---

[1] The facts in this section are drawn from Appellants' Second Amended Complaint.

[2] Apache Corporation and Apache Shelf, Inc.

[3] Mariner Energy, Inc., Mariner Energy Resources, Inc., f/k/a Mariner Energy, Inc., Mariner Energy Resources, and Mariner Energy, Inc. f/k/a Forest Energy Resources.

[4] IP Petroleum Company and International Paper Company.

[5] Pure Resources, LLC, Union Oil Company, Union Oil Company d/b/a Unocal, Chevron U.S.A., Inc.

[6] Forest Oil Corporation.

[7] Now known as the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE").

[8] We have explained that, "[o]ur review of legal authority on the oil and gas industry shows that the meaning of 'completion' assumes that a hole has just been drilled, but the term is considered to be indefinite and is not explicitly restricted to drilling." *Burns v. La. Land & Exploration Co.*, 870 F.2d 1016, 1022 (5th Cir. 1989); *see also id.* at 1021 ("In sum,

2

No. 13-20307

"Middle Cib Op Zone." The records, however, did not reflect any completed well production from the K-1 sands. Breton and Conn therefore spent $6 million to drill and complete the K-1 sands, but were disappointed with the results. They allege that the reservoir is depleted.

Appellants allege that IP perforated[9] the K-1 sands.[10] In 1998, IP operated WC 172 and decided to drill on its northwestern corner. Seismic data indicated two oil and gas reserves: one in the K-1 sands (Upper Cib Op) and one in the K-2 sands (Middle Cib Op). IP submitted its drilling plans to MMS for approval and notified Conn of its intention to drill in an area neighboring WC 171. Conn objected to IP's proposed well location ("Well No. 19"), but MMS approved IP's plan over Conn's objection. MMS required, however, that IP produce the reservoirs as "two separate completions." Therefore, "IP was **not** authorized to proceed with dual completions; it had to select one zone for its first completion" and then obtain MMS approval for any subsequent completion (emphasis in original).[11] In 1999, IP informed MMS that it completed the well in the K-2 sands. But Breton and Conn allege that IP "actually completed in the K-1 sands at the same time it completed in the K-2 sands." They reason that IP's production from the K-2 sands has exceeded IP's estimate by almost 30%.[12] Appellants maintain that "[t]his significant

the specialized industry definition of completion is primarily concerned with an event following drilling; no mention is made of the termination of reworking operations.").

[9] "Perforation" is "[t]he making of holes in casing and cement (if present) to allow formation fluids to enter the well bore." 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law*, at 752 (2013).

[10] Appellants alternatively alleged that Forest perforated the K-1 sands, but have abandoned this theory. Instead, Appellants now rely only on the first theory—that IP perforated the K-1 sands in 1999.

[11] A "[d]ual completion" is "[t]he completion of a well into two separate producing formations at different depths." 8 Williams & Meyers, *Oil and Gas Law*, at 301 (2013).

[12] Appellants further allege that IP claimed that the K-2 sands would yield a recovery of more than 50% than originally expected.

3

No. 13-20307

overproduction suggests that the hydrocarbons in the K-1 sands had become commingled" with the K-2 sands.

Appellants sued, alleging that Appellees committed "unlawful drainage" in violation of federal and Louisiana law. Appellees moved to dismiss under Rule 12(b)(6). The district court dismissed Appellants' First Amended Complaint but granted leave to amend. Appellants filed a Second Amended Complaint that alleged a claim for "waste" in addition to a claim for "unlawful drainage and trespass." Appellees moved to dismiss the Second Amended Complaint, and Appellees' motion to dismiss remained pending for six months while discovery proceeded. The district court subsequently dismissed Appellants' Second Amended Complaint on the day before the deadlines for discovery and dispositive motions.[13] Breton and Conn timely appealed.

## STANDARD

This Court reviews dismissal under Rule 12(b)(6) *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## DISCUSSION

Appellants' complaint alleges two counts, one for waste and one for unlawful drainage and trespass.[14]

---

[13] Although the district court entered a final judgment after granting Appellees' motion to dismiss, Appellees filed a motion for summary judgment the next day.

[14] Appellants have abandoned a third count for fraud and negligent misrepresentation.

## A.     Choice of Law

The conduct alleged occurred on the Outer Continental Shelf. Accordingly, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333, controls this dispute. "Under the OCSLA, the law to be applied to the [Outer Continental Shelf] is exclusively federal, albeit the law of the adjacent state is adopted as surrogate federal law to the extent that such law is applicable and not inconsistent with federal law." *Total E & P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013). Louisiana is the adjacent state in this case; therefore, it is undisputed that Louisiana law applies "to the extent" it is "not inconsistent" with federal law. § 1333(a)(2)(A). The parties do not identify any substantive difference or inconsistency between federal and Louisiana law as it applies to this case.[15]

## B.     Waste

### 1.     The Rule of Capture and Waste

Louisiana law incentivizes property owners to develop their lands without concern for collateral effects on neighboring owners. In what is known as the "Rule of Capture," Louisiana law provides:

> A landowner may use and enjoy his property in the most unlimited manner for the purpose of discovering and producing minerals, provided it is not prohibited by law. He may reduce to possession and ownership all of the minerals occurring naturally in a liquid or gaseous state that can be obtained by operations on or beneath his land even though his operations may cause their migration from beneath the land of another.

---

[15] Applying the federal definition of waste is consistent with this Court's previous recognition that "[f]ederal law determines our disposition" of waste claims. *La. ex rel. Guste v. United States*, 832 F.2d 935, 943–44 (5th Cir. 1987). The district court applied Louisiana law, however, likely because the parties do not substantively differentiate between the two and because the parties do not contend that it makes a practical difference to the case.

No. 13-20307

La. Rev. Stat. Ann. § 31:8. Consistent with the Rule of Capture, Louisiana law prohibits claims for "drainage," though it carves out a relevant exception:

> A landowner has no right against another who causes drainage of liquid or gaseous minerals from beneath his property if the drainage results from drilling or mining operations on other lands. *This does not affect his right to relief for negligent or intentional waste under Articles 9 and 10,* or against another who may be contractually obligated to protect his property from drainage.

La. Rev. Stat. Ann. § 31:14 (emphasis added).[16] In turn, Article 9 establishes the correlative rights of landowners in a common reservoir, "Landowners and others with rights in a common reservoir or deposit of minerals have correlative rights and duties with respect to one another in the development and production of the common source of minerals," La. Rev. Stat. Ann. § 31:9, and Article 10 provides for liability when correlative rights are breached:

> A person with rights in a common reservoir or deposit of minerals may not make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights, or that may intentionally or negligently cause damage to him. This Article and Article 9 shall not affect the right of a landowner to extract liquid or gaseous minerals in accordance with the principle of Article 8.

La. Rev. Stat. Ann. § 31:10.

Restated, Article 10 "provides a remedy to a person with rights in a reservoir when the value of his rights has been diminished by the negligent or intentional acts of another." *Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So. 2d 11, 39 (La Ct. App. 2002); *Breaux v. Pan Am. Petroleum Corp.*, 163 So. 2d 406, 413 (La. Ct. App. 1964) ("[A] landowner is not entitled to recover Damages from the Owner or lessee of adjoining lands on the ground that oil and gas have been

---

[16] Appellants do not allege a contractual obligation between the parties.

drained from beneath his property by wells located on the adjacent tract, unless it is established that the oil or gas withdrawn from the common reservoir has been wasted, that the waste was caused by the negligence of defendant or by his willful intent to injure plaintiff . . . .").

Louisiana law further defines "waste" as "'physical waste' as that term is generally understood in the oil and gas industry" and provides that waste includes:

> (a) the inefficient, excessive, or improper use or dissipation of reservoir energy; and the location, spacing, drilling, equipping, operating, or producing of an oil or gas well in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from a pool; and (b) the inefficient storing of oil; the producing of oil or gas from a pool in excess of transportation or marketing facilities or of reasonable market demand; and the locating, spacing, drilling, equipping, operating, or producing of an oil or gas well in a manner causing, or tending to cause, unnecessary or excessive surface loss or destruction of oil or gas. (c) The disposal, storage or injection of any waste product in the subsurface by means of a disposal well.

La. Rev. Stat. Ann. § 30:3(16). Federal regulations provide a substantively identical definition of waste.[17] Considering these provisions, no party disputes that Appellants may properly plead a cause of action for waste in this case. The only question on this count is whether the allegations in the Second Amended Complaint sufficiently allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012).

---

[17] The federal definition provides: "(1) The physical waste of oil, gas, or sulphur; (2) The inefficient, excessive, or improper use, or the unnecessary dissipation of reservoir energy; (3) The locating, spacing, drilling, equipping, operating, or producing of any oil, gas, or sulphur well(s) in a manner that causes or tends to cause a reduction in the quantity of oil, gas, or sulphur ultimately recoverable under prudent and proper operations or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas; or (4) The inefficient storage of oil." 30 C.F.R. § 250.105.

**2.    The Second Amended Complaint States a Claim for Waste Against IP**

Appellants allege that Appellees committed waste by reducing the quantity of oil and gas recoverable under prudent and proper operations;[18] inefficiently, excessively, or improperly using, or unnecessarily dissipating reservoir energy;[19] and physically wasting hydrocarbons.[20] We first address the claims against IP, the defendant alleged to have perforated K-1.

**a.    Reduction of the quantity of recoverable oil and gas**

Appellants' first theory of waste alleges that Appellees "decreased the amount of oil ultimately recoverable from the K-1 sands." The district court held that Appellants' allegations did not state a claim for waste because "[w]aste requires the loss of a considerable amount of hydrocarbons . . . and the Second Amended Complaint offers only conclusory allegations that the alleged commingling . . . prevented the maximum recovery of oil and gas." "[A]ccepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs," however, the factual allegations in the complaint (which incorporate the statements of Apache's own representative) plausibly state

---

[18] 30 C.F.R. § 250.105 (defining waste to include the "producing of any oil, gas, or sulphur well(s) in a manner that causes or tends to cause a reduction in the quantity of oil, gas, or sulphur ultimately recoverable under prudent and proper operations"); La. Rev. Stat. Ann. § 30:3 (16) (defining waste to include the "producing of an oil or gas well in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from a pool").

[19] 30 C.F.R. § 250.105 (defining waste to include the "inefficient, excessive, or improper use, or the unnecessary dissipation of reservoir energy"); La. Rev. Stat. Ann. § 30:3 (16) (defining waste to include "the inefficient, excessive, or improper use or dissipation of reservoir energy").

[20] 30 C.F.R. § 250.105 (defining waste to include "[t]he physical waste of oil, gas, or sulphur"); La. Rev. Stat. Ann. § 30:3 (16) (defining waste to "mean[] 'physical waste' as that term is generally understood in the oil and gas industry").

that IP committed waste. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

First, Appellants allege that "IP actually completed in the K-1 sands at the same time it completed in the K-2 sands." As support, Appellants allege that the bottom-hole pressure in K-1 reflects that it has been depleted. Instead of an expected bottom-hole pressure of 5,900 pounds per square inch ("psi"), the actual bottom-hole pressure is 1,332 psi. On this point, Appellants' complaint incorporates statements from Apache's representative, Paul Gluth. Although we must accept all factual allegations as true, we need not accept the portions of Gluth's statements that are not factual allegations; instead, we must accept only the factual bases contained in his statements.[21]

Appellants allege that Gluth understood that the lower-than-expected bottom-hole pressure "confirm[ed] 'substantial drainage' of the K-1 sands." Gluth stated further that he had "not seen or reviewed anything that would indicate" a natural geological connection between the K-1 sands and another zone and that the cement bond sealing "would provide adequate isolation between zones" as to prevent migration. Additionally, Gluth stated that there would be no other explanation for a substantial depletion of K-1 other than a

---

[21] The incorporation of such a large amount of deposition testimony into the Second Amended Complaint reflects the unusual posture of this case. As discussed, discovery proceeded while Appellees' motion to dismiss the Second Amended Complaint was pending, and the district court granted the motion the day before the discovery deadline. Indeed, Appellees moved for summary judgment the day after the district court granted dismissal of the Second Amended Complaint. Even without Appellees' motion for summary judgment, however, the district court had at its disposal Rule 56(f), which provides that after giving notice and time for the parties to respond, a district court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). Invoking this option may be the most efficient procedure for district courts when, as here, the parties have conducted significant discovery.

perforation at the K-1 level.[22] Gluth's statements therefore include certain facts that render Appellants' allegation of IP's perforation plausible: there was no geological communication between the zones, there was no defect in the cement bond sealing, and a perforation between the zones caused the depletion. Accordingly, we must accept as true the well-pleaded factual allegation that IP perforated in the K-1 sands.

Second, Appellants allege that there has been "commingling" between K-1 and K-2. As evidence of "commingling," Appellants allege that IP will recover more than 30% than expected from K-2, and that IP has estimated that they will eventually recover 50% more than expected. "This significant overproduction," the complaint alleges, "suggests that the hydrocarbons in the K-1 sands had become commingled with the hydrocarbons in the K-2 sands." Additionally, Appellants allege that the pressure in the K-1 reservoir is virtually equal to the pressure in the K-2 reservoir, a fact the complaint alleges "is a telltale signal of communication between the wells." Gluth also stated: "If two reservoirs . . . are allowed to communicate, the fluid, whether it's gas, water or oil will equalize between them." We must accept as true Appellants'

---

[22] Appellees contend that the complaint mischaracterizes Gluth on this point, highlighting that "Gluth had testified earlier that he did not know . . . whether there had been any communication between the K-1 and K-2 sands, and also that his investigation of the issue went only so far as the well file." Even assuming that portions of Gluth's statements not included in the complaint may be considered at this stage, *see Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000), Gluth's statements reveal that he investigated to see if there was any indication of communication between K-1 and K-2. Gluth stated that he "has not reviewed anything or seen anything to indicate that there is a communication between K-1 and K-2" after "look[ing] for that . . . [i]n the well file." This statement supports Appellants' allegation that IP perforated K-1. Nonetheless, disputes about the weight of specific statements are not resolved on a Rule 12(b)(6) motion, as all facts must be assessed as alleged in the complaint and viewed in the light most favorable to the plaintiffs. *Morris v. Livingston*, 739 F.3d 740, 745 (5th Cir. 2014). We therefore must accept Appellants' allegations as true, without prejudicing future rulings by the district court.

well-pleaded factual allegation that there has been commingling between K-1 and K-2.

Third, Appellants allege that "[c]ommingling causes waste" and that the commingling in this case "prevents the maximum recovery of oil and gas from each reservoir, constituting waste." As proof that commingling causes waste by reducing the maximum recovery of oil and gas, Appellants again rely on Gluth's statements. Gluth stated that "[w]hen two zones are commingled that are not related or not in communication naturally . . . the question arises as to whether or not you can achieve *a full recovery* that you—the same recovery that you may have achieved by producing them separately" and that "you may no longer be able to produce the same amount of hydrocarbon that you would if you produced them separately without being affected by one another" (emphasis added). We must accept as true Appellants' factual allegation that commingling causes waste.

Moreover, the MMS permit provided to IP suggests that the danger of commingling was present as applied to the K-1 and K-2 sands. *Cf. Romero v. Mobil Exploration & Producing N. Am., Inc.*, 939 F.2d 307, 311 (5th Cir. 1991) ("While there is no implied cause of action from the mere breach of MMS regulations, Louisiana law does recognize that applicable federal regulations may be relevant evidence in weighing a defendant's culpability."). As alleged in the complaint, Conn objected to IP's plan to drill. MMS granted IP's permit over Conn's objection and required IP to complete the reservoirs on two separate occasions. MMS explained in a letter to IP that "[t]he reservoirs are to be produced as two separate completions" and that "Conn's correlative rights

have not been violated."[23] When speaking about the MMS's dual-completion requirement for K-1 and K-2, Gluth explained that it "is a matter of conservation." Accordingly, the MMS authorization, which purported to protect Conn's correlative rights, expressly prohibited a dual completion precisely because a dual completion threatens the maximum recovery of oil and gas. To be sure, IP's MMS violation does not, as Appellees recognize, by itself constitute waste; instead, it serves as evidence that it has reduced the total loss of recoverable oil and gas. *Romero*, 939 F.2d at 311. We accept as true the allegations that IP violated the dual-completion requirement expressly aimed at preventing waste.

The allegations in the Second Amended Complaint also plausibly support the inference that IP acted intentionally or negligently. *See* La. Rev. Stat. Ann. § 31:10 ("A person with rights in a common reservoir or deposit of minerals may not make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights, or that may intentionally or negligently cause damage to him."). The Second Amended Complaint alleges that in 1999 IP submitted plans to drill in both the K-1 and K-2 sands and that "Conn submitted a letter to the MMS objecting to the proposed location of Well No. 19." The MMS order overruled Conn's objection and purported to protect Conn's correlative rights by requiring two separate completions. This dual-completion requirement was a matter of "conservation." Accordingly, IP's alleged breach of this requirement plausibly supports the inference that IP at least acted negligently—both Conn's objection

---

[23] While not attached to the complaint, this letter is referenced in the complaint and central to Appellants' claims. *See Collins*, 224 F.3d at 498–99; *Walch v. Adjutant General's Dep't of Tex.*, 533 F.3d 289, 294 (5th Cir. 2008) (considering exhibits attached to an opposition because "[n]o party questions the authenticity of these two documents and both were sufficiently referenced in the complaint to permit their consideration on a motion to dismiss").

and the MMS order alerted IP to the potential damage that it could cause Conn by perforating K-1. Appellants have therefore plausibly stated a claim that IP committed waste.

Our opinion in *Guste* provides an illustrative contrast. In *Guste*, the plaintiff brought a waste claim and "contend[ed] that Samedan's well spacing and production practices tend to cause reduction in the quantity of gas ultimately recoverable." 832 F.2d at 944. We affirmed summary judgment in favor of defendants because:

> The closest Louisiana got to this issue was expert testimony given during the hearing on the state's motion for a preliminary injunction that coordinated exploration might enhance the amount of hydrocarbons ultimately recovered. Against that suggestion was detailed proof by Samedan of prudent operations *in accord with federal regulations* and under substantial oversight by the MMS.

*Id.* (emphasis added). Not only did the Court in *Guste* review a summary-judgment record, it specifically noted as material that the defendant was operating "in accord with federal regulations." *Id.* Here, by contrast, we accept all of Appellants' factual allegations as true and note that Appellants have alleged that IP violated an MMS order that was specifically aimed at conservation.[24] Appellants' detailed allegations therefore surpass *Twombly*'s plausibility hurdle.

Appellees respond by making a number of interrelated arguments. First, they fault Appellants because "[t]hey do not allege any act by any Defendant

---

[24] *Mobil Exploration*, illustrates the type of case allowed to proceed to the merits. In *Mobil Exploration*, the Louisiana Court of Appeals upheld a trial verdict because "the trial court had a reasonable evidentiary basis for finding that a considerable amount of hydrocarbons, that would otherwise have been available for commercial production, were lost as a result of the underground blowout caused by the negligence of Cliffs and Cliffs' subsequent faulty efforts to control the blowout." 837 So. 2d at 39. That "[d]efendants maintain[ed] such testimony was purely speculative and/or based on defective data," did not matter.

that resulted in the actual physical reduction of the amount of oil or gas ultimately recoverable from the K-1 sands." But the Second Amended Complaint expressly does allege, among other things, that "[w]hen Defendants completed in both the K-1 and K-2 sands and commingled the reservoirs, they reduced the recovery of oil and gas." The Second Amended Complaint further alleges that "by failing to follow the orders and regulations of the MMS . . . Defendants improperly used the K-1 reservoir energy and decreased the amount of oil ultimately recoverable from the K-1 sands, constituting waste." IP may ultimately show that there was no waste in this case, but the merits of Appellants' claims are not at issue on a motion to dismiss. *See Wilson*, 667 F.3d at 600 ("At this stage, [defendants'] rebuttals must be ignored and [plaintiffs'] assertions taken as true.").

Second, Appellees argue that the allegations that the K-2 sands are overproducing are self-defeating because "[p]laintiffs do not allege that the amount of oil and gas recoverable was reduced; instead, they allege that a ***greater than expected*** amount of oil and gas was recovered" (emphasis in original). As discussed above, Appellants do allege that "[Appellees] reduced the recovery of oil and gas." Moreover, the fact that K-2 is overproducing is evidence that the K-1 and K-2 sands have been commingled. A claim for waste concerns the *total* recoverable amount of oil and gas, and, as Gluth explained, "[w]hen two zones are commingled that are not related or not in communication naturally . . . the question arises as to whether or not you can achieve a full recovery that you—the same recovery that you may have achieved by producing them separately." Accordingly, the overproduction of K-2 supports a commingling theory and is also indicative of a total loss of recoverable hydrocarbons because once commingled, "you may no longer be able to produce the same amount of hydrocarbon that you would if you

No. 13-20307

produced them separately without being affected by one another." That K-2 is producing beyond expectations does not defeat an allegation that the total recoverable oil and gas in the wells has been reduced.

Third, Appellees argue that "commingling on its own is not waste." This is correct, but at this stage the question is whether Appellants have plausibly alleged that commingling occurred in this case and that the commingling resulted in the loss of recoverable hydrocarbons. To the extent Appellees' argument is that commingling could never be waste, it is an argument without authority and expressly contradicted by Gluth's statements.

Accordingly, Appellants have adequately alleged that IP "produc[ed] . . . an oil or gas well in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from a pool." La Rev. Stat. Ann. § 30:3(16)(a).

### b.    Inefficiently, excessively, or improperly using, or unnecessarily dissipating reservoir energy

Appellants, relying on the reduction in reservoir pressure in K-1, argue that by commingling the reservoirs in violation of the MMS regulations, IP improperly used and unnecessarily dissipated reservoir energy. Reservoir energy is "[t]he forces in a reservoir which propel the oil or gas to the well bore." 8 Williams & Meyers, *Oil and Gas Law*, at 896 (2013). One treatise explains that "[w]aste of reservoir energy" is "[t]he failure reasonably to maintain such energy by artificial means and also the dissipation of gas energy . . . at any time at a rate or in a manner which would constitute improvident use of the energy available or result in loss thereof without reasonably adequate recovery of oil." *Id.* at 1135.[25]

---

[25] *See also Note, Conservation of Natural Gas and the Federal-State Conflict*, 64 Colum. L. Rev. 888, 898 (1964) ("[M]ost conservation statutes include in the definition of

No. 13-20307

The parties do not distinguish between the "improper use" and "unnecessary dissipation" of reservoir energy, but Appellants focus on IP's alleged MMS violation to sustain their theory that IP "improperly" used reservoir energy.[26] Appellants allege that "the reservoir pressure that should have been present had been substantially reduced—reflecting a substantial depletion of the reservoir" and that the discrepancy in bottom-hole pressure "confirms 'substantial drainage' of the K-1 sands." Appellants further allege "[h]ad Defendants produced in the K-1 and K-2 sands separately as the MMS required, they would have ensured the efficient, reasonable and proper use of reservoir energy in the K-1 sands." This theory is plausibly alleged for many of the same reasons as the "total recovery" theory. Specifically, the MMS regulations contemplated two separate completions and Appellants have alleged a drop in expected bottom-hole pressure in the K-1 sands. Accordingly, it is plausible that by perforating the K-1 sands, IP improperly used and

---

waste the inefficient, improper, or excessive dissipation of reservoir energy. Reservoir energy includes, in addition to gas pressure, water motivated by hydrostatic pressure, gravitational force, and expansion of reservoir oil upon the release of pressure."); Owen L. Anderson, *Exploratory Unitization Under the 2004 Model Oil and Gas Conservation Act: Leveling the Playing Field*, 24 J. Land Resources & Envt'l L. 277, 278 (2004) ("The resulting 'flush' production that resulted from the drilling of too many wells inefficiently dissipated the natural reservoir energy that pushed the oil and gas through the reservoir and into well bores, thereby causing underground waste. Because of this rapid dissipation of internal reservoir pressure, hydrocarbons that would otherwise have been produced became unrecoverable."); Brad Secrist, *Not All "Units" are Created Equal*, 65 Okla. L. Rev. 157, 159 (2012) ("Over-drilling can also damage the natural reservoir energy necessary to extract the oil and gas and result in irreparable damage to the recoverability of valuable hydrocarbons. Once the natural reservoir energy has dissipated, extraction of the oil or gas often becomes economically unfeasible.").

[26] *See* 1 Summers Oil and Gas § 4:10 (3d ed. 2013) ("In the states defining the waste of oil and gas as including the waste of reservoir energy, the conservation agencies have the authority to make rules and regulations governing the use of reservoir energy, including the authority to require gas-oil ratios and to fix those ratios. . . . These statutes were directed principally to preventing the waste of gas in the production of oil and authorized conservation agencies to fix gas-oil production ratios. Some of these statutes defined waste as including the waste of gas energy and water drive.").

16

dissipated the reservoir energy which has the consequence of reducing the total amount of recoverable oil and gas.

### c.    Physical waste

Louisiana law explains that "[w]aste" means "'physical waste'" as that term is generally understood in the oil and gas industry"[27] and "[i]ncludes," among other things, the "inefficient, excessive, or improper use or dissipation of reservoir energy; . . . or producing of an oil or gas well in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from a pool." La. Rev. Stat. Ann. § 30:3(16); *see also* 8 Williams & Meyers, *Oil and Gas Law*, at 1133 (2013) ("Physical waste is the loss of oil or gas that could have been recovered and put to use. Such waste can occur on the surface or underground . . . Examples of the latter are inefficient use of reservoir energy . . . ."). Appellants' physical waste claim is similar to its claim that IP has reduced the total amount of recoverable hydrocarbons: "commingling . . . has reduced the amount of hydrocarbons that can be recovered—leaving a greater quantity of hydrocarbons in the reservoir, which cannot be extracted now." As discussed, because the complaint alleges facts that satisfy the statute's illustrative examples of physical waste, Appellants' waste claim may proceed against IP on this ground as well.

### 3.    Claims Against the Non-perforating Defendants

Although the Second Amended Complaint states a waste claim against IP, the company that allegedly perforated K-1, it insufficiently alleges that the non-perforating defendants committed waste. Appellants allege that the non-

---

[27] Physical waste "is commonly understood in the oil and gas industry as referring to operational losses in oil and gas production resulting from either: surface loss or destruction of oil and gas; or, underground loss or destruction of oil and gas." *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 224 (Wyo. 1994).

perforating defendants committed waste by failing to submit reports to the MMS reflecting IP's perforation of K-1. "Had Defendants submitted such information to the MMS," Appellants allege, "it would have prevented commingling of hydrocarbons from the K-1 and K-2 sands or taken other steps to protect the correlative rights of adjacent lessees." These allegations are defective because they simply conclude that the non-perforating defendants knew about IP's perforation of K-1 (alleging for example: "Despite having actual or constructive knowledge of the completion and production activities in the K-1 sands . . . ."), and that MMS would have intervened in a way to prevent the loss of the amount of oil and gas ultimately recoverable or otherwise prevented waste.

The Second Amended Complaint's cross-references to Gluth's statements reveal its defects. Gluth stated that MMS requires these reports simply because "they are charged with the overseeing of the natural resource, particularly from a conservational point of view and also from a revenue-generating point of view from the government." This statement says nothing about the manner in which MMS may respond to violations or its ability to prevent commingling once it has begun. Moreover, the allegations themselves equivocate, alleging that MMS "would have prevented commingling of hydrocarbons from the K-1 and K-2 sands *or taken other steps to protect the correlative rights* of adjacent lessees" (emphasis added). No allegation explains what these "other steps" might be or how they relate to Appellees' liability for waste. Nor do Appellants provide any authority supporting their arguments that failing to report would satisfy any of the other definitions of waste. Accordingly, the district court properly dismissed the waste claims against the non-perforating defendants. *See, e.g.*, *Blank v. Eavenson*, 530 F. App'x 364, 370

(5th Cir. 2013) ("Speculation, however, is not the applicable pleading standard.").

## C.     Unlawful Drainage

The Second Amended Complaint alleges a claim for "unlawful drainage," which Appellants allege is actionable under La. Rev. Stat. Ann. §§ 31:9[28] and 10.[29]

### 1.     Article 14 Precludes Drainage Claims

The first obstacle to Appellants' second cause of action is that Louisiana law plainly precludes drainage claims:

> [a] landowner has *no right* against another who causes drainage of liquid or gaseous minerals from beneath his property if the drainage results from drilling or mining operations on other lands. This does not affect his right to relief for negligent or intentional waste under Articles 9 and 10, or against another who may be contractually obligated to protect his property from drainage.

La. Rev. Stat. Ann. § 31:14 (emphasis added).

In an attempt to avoid Article 14's plain prohibition on claims for drainage (and sole listed exception for waste), Appellants argue that "every violation of correlative rights constitutes 'waste' within the meaning of Article 14." Appellants' theory, however, blurs the recognized distinction between viable waste claims and nonviable drainage claims. In *Guste*, for example, we explained: "Correlative rights 'means the right of each lessee to be afforded an equal opportunity to explore for, develop, and produce, without waste, oil or

---

[28] "Landowners and others with rights in a common reservoir or deposit of minerals have correlative rights and duties with respect to one another in the development and production of the common source of minerals."

[29] "A person with rights in a common reservoir or deposit of minerals may not make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights, or that may intentionally or negligently cause damage to him. This Article and Article 9 shall not affect the right of a landowner to extract liquid or gaseous minerals in accordance with the principle of Article 8."

gas, or both, from a common source.' The definition of correlative rights *excludes claims for drainage losses* and is consistent with the rule of capture." 832 F.2d at 943 (emphasis added). Therefore, we concluded, "Louisiana's third cause of action is limited to an assertion that [the defendant] is committing waste." *Id.*

Additionally, if all claims for drainage are indeed claims for waste, then Article 14's proclamation that "[a] landowner has no right against another who causes drainage" would be a nullity; the exception for "negligent or intentional waste under Articles 9 and 10" would swallow the rule against drainage actions. *See Williams v. Humble Oil & Refining Co.*, 432 F.2d 165, 171–172 (5th Cir. 1970) ("The general rule in Louisiana is that the landowner has no cause of action for damages against the owner of the adjoining property or his lessee for drainage of oil and gas from beneath his land."); *Breaux*, 163 So. 2d at 413 ("[A] landowner is not entitled to recover Damages from the Owner or lessee of adjoining lands on the ground that oil and gas have been drained from beneath his property by wells located on the adjacent tract, unless it is established that the oil or gas withdrawn from the common reservoir *has been wasted*, that the waste was caused by the negligence of defendant or by his willful intent to injure plaintiff . . . ." (emphasis added)).[30]

---

[30] *See also Knighton v. Texaco Producing, Inc.*, 762 F. Supp. 686, 689–90 (W.D. La. 1991) ("If Louisiana had adopted the rule in an unmodified form, an owner could have drilled as many wells on his land as he cared to drill. To avoid actual or perceived drainage, however, his neighbor could have drilled as many retaliatory wells as he deemed necessary. . . . Society would not tolerate the unbridled lust for oil and gas to dissipate a natural resource. The property owner's unlimited right to explore had to be curtailed in the name of conservation. Thus, exercising its police power *to prevent waste*, the Louisiana Legislature passed conservation measures that were, and are, administered by the Department of Conservation, headed by a Commissioner of Conservation." (emphasis added)).

Appellants' attempts to reframe their claim for drainage as a general claim for "violations of correlative rights" under Article 9 and 10 are similarly unavailing. Their complaint states it is seeking to remedy "unlawful drainage." For example, Appellants allege that "[b]ecause Defendants unlawfully drained minerals from the K-1 sands (acting wastefully and in violation of their own lease), they are liable to Plaintiffs for unlawful drainage." Article 14 precludes claims for drainage, subject to the exceptions discussed below, without prejudicing distinct claims for waste. *See Guste*, 832 F.2d at 943 ("The definition of correlative rights *excludes claims for drainage losses* and is consistent with the rule of capture. Therefore, Louisiana's third cause of action is limited to an assertion that [Defendant] is committing waste . . . ." (emphasis added)).

### 2.    The Trespass Exception to the Rule of Capture

It is undisputed that there is an exception to Article 14's prohibition against drainage actions when the defendant has committed trespass onto the aggrieved landowner's property. This exception is embedded in Article 14's text: "[a] landowner has no right against another who causes drainage of liquid or gaseous minerals from beneath his property *if the drainage results from drilling or mining operations on other lands*." La. Rev. Stat. Ann. 31:14 (emphasis added). If the drainage results from trespass that takes place on the aggrieved landowner's property, then Article 14 is inapplicable. Appellants argue that they have alleged trespass in this case, and, in the alternative, that Article 14's Rule of Capture does not apply when a landowner procures minerals in violation of MMS regulations.

### a.    Regulatory violations are not trespasses.

Appellants allege that "[d]rainage of minerals in violation of the lease and applicable law is *tantamount* to a trespass, and for this reason, is not

protected by the rule of capture" (emphasis added). Significantly, Appellants do not allege that Appellees physically trespassed onto their land. Instead, their claim is that Appellees violated the terms of their own lease "and for that reason, [they] trespassed on *federal property* when they took minerals without permission" (emphasis added).

As an initial matter, Appellants are alleging trespass on behalf of a third party (in this case the federal government). The trespass exception in Article 14 conditions the Rule of Capture's applicability to instances when the "drainage results from drilling or mining operations on other lands." La. Rev. Stat. Ann. 31:14. Even if Appellants are correct that Appellees "trespassed" onto the government's lands, this would still be "other lands" under the text of Article 14. Moreover, trespass in these circumstances commonly takes the form of subsurface trespass. *See, e.g.*, *Nunez v. Wainoco Oil & Gas Co.*, 488 So. 2d 955, 959 (La. 1986) (noting that "subsurface trespass . . . involves bottoming of a well on the land of another without his consent, and/or invading or intruding upon the subsurface of another's land"). Appellants rely on *Gliptis v. Fifteen Oil Co.*, 16 So. 2d 471, 474 (La. 1943), for the proposition that a regulatory violation equates to an unlawful trespass. But in *Gliptis*, "defendant's well was drilled at an angle from a vertical or upright line, causing it to pass into and through, and have its bottom in, property from which plaintiff alone had the right to extract gas and oil." *Id.* at 473. The Court recognized that the Rule of Capture "necessarily excludes the right of any person to invade the subsurface of his neighbor's land and to extract therefrom fugacious minerals, such as oil and gas. Such invasion would be a trespass." *Id.* at 474. Appellants do not allege that Appellees physically invaded their land; accordingly, Appellants have not alleged an exception to the Rule of Capture and their drainage claim is barred.

No. 13-20307

### b.    Regulatory violations do not constitute an exception to Article 14.

Alternatively, Appellants argue that trespass is not the only exception to Article 14's prohibition against drainage claims. They contend that "[t]he rule of capture does not protect unlawful conduct"; specifically, they argue that "a party who takes minerals in violation of applicable regulations has engaged in conduct 'prohibited by law,' and cannot hide behind the rule of capture." Appellants' argument contravenes the text of Article 14, which does not condition its prohibition of drainage actions on regulatory compliance. Appellants argue that the general codification of the Rule of Capture in Article 8 contains a requirement that the landowner comply with regulations. Article 8 provides that "[a] landowner may use and enjoy his property in the most unlimited manner for the purpose of discovering and producing minerals, provided it is *not prohibited by law*." La. Rev. Stat. Ann. § 31:8 (emphasis added). Appellants do not convincingly explain why Article 8's general statement of the Rule of Capture should control over Article 14's specific prohibition of drainage actions.

Appellants rely on *Elliff v. Texon Drilling Co.*, 210 S.W.2d 558 (Tex. 1948), a Texas case cited in the comments to Article 10. *See* La. Rev. Stat. Ann. § 31:10. Importantly, Appellants' description of *Elliff* recognizes that, "[i]n *Elliff*, *the plaintiffs sued for negligent waste* and dissipation of minerals following the blowout of a well being drilled by defendants on adjacent property" (emphasis added); *see Elliff*, 210 S.W.2d at 560 ("[O]ur attention will be confined to the sole question as to whether the law of capture absolves respondents of any *liability for the negligent waste* or destruction of petitioners' gas and distillate, though substantially all of such waste or destruction

23

occurred after the minerals had been drained from beneath petitioners' lands." (emphasis added)).

Appellants extract their proposed rule—that drainage claims can proceed if the landowner is in violation of regulations—from the following passage in *Elliff*:

> The landowner is privileged to sink as many wells as he desires upon his tract of land and extract therefrom and appropriate all the oil and gas that he may produce, *so long as he operates within the spirit and purpose of conservation statutes and orders of the Railroad Commission.* These laws and regulations are designed to afford each owner a reasonable opportunity to produce his proportionate part of the oil and gas from the entire pool and to prevent operating practices injurious to the common reservoir. . . . But from the very nature of this theory the right of each land holder is qualified [sic], and is limited to *legitimate operations.* . . .

*Elliff*, 210 S.W.2d at 562 (emphasis added). But *Elliff* recognizes that a landowner's regulatory noncompliance is relevant to waste claims: "In like manner, *the negligent waste* and destruction of petitioners' gas and distillate *was neither a legitimate drainage* of the minerals from beneath their lands nor a lawful or reasonable appropriation of them." *Id.* 563 (emphasis added); *id.* ("Thus under the common law, and independent of the conservation statutes, the respondents were legally bound to use due care *to avoid the negligent waste* or destruction of the minerals imbedded in petitioners' oil and gas-bearing strata." (emphasis added)). The Court concluded, "[w]e are therefore of the opinion [that] the Court of Civil Appeals erred in holding that under the law of capture the petitioners cannot recover for the damages resulting from the wrongful drainage of the gas and distillate from beneath their lands," *id.*, but the opinion maintains the distinction between negligent waste (as evidenced by unlawful drilling) and drainage, which does not deprive landowners "the

24

No. 13-20307

opportunity to produce his fair share of the recoverable oil and gas beneath his land." *Id.* at 562.[31]

Article 14, by its plain terms prohibits the drainage claims Appellants press in this case: "[a] landowner has *no right* against another who causes drainage of liquid or gaseous minerals from beneath his property." La. Rev. Stat. Ann. § 31:14 (emphasis added). Appellants' drainage claim therefore fails.

### CONCLUSION

For the above stated reasons, we AFFIRM the district court as to the claims for waste against all defendants but IP and AFFIRM the district court as to the claims for drainage against all defendants. We VACATE and REMAND, however, as to Appellants' waste claim against IP.

---

[31] Appellants also rely on 1 Williams & Meyers, *Oil and Gas Law* § 204.7 (2013), in support of their theory of drainage. The treatise explains, "The Louisiana Mineral Code and case law have clarified that Louisiana's adoption of a nonownership theory does not preclude recovery of damages by an adjacent owner for the value of recoverable hydrocarbons negligently lost. It thus appears that in all of these states a cause of action for damages may arise in favor of one landowner as the result of the negligent conduct of a neighboring landowner resulting in the *waste* of otherwise recoverable hydrocarbons." *Id.* at 70–71 (emphasis added). This last clarifying sentence is salient.